UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

WESTFIELD INSURANCE COMPANY,

        Plaintiff,

v.                            Civil Action No. 2:17-cv-01269

STEVEN R. MATULIS, M.D.;
CHARLESTON GASTROENTEROLOGY
ASSOCIATES, P.L.L.C.; T.W.; K.H.;
T.F.; J.L.; A.G.; B.D.; A.H.;
A.M.; C.S.; and J.W.,

        Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

        Pending is plaintiff Westfield Insurance Company's

("Westfield") motion for summary judgment, filed November 30,

2017.

I.    Background

        Westfield filed this declaratory judgment action on

February 14, 2017, pursuant to 28 U.S.C. § 2201 and the West

Virginia Uniform Declaratory Judgments Act, W. Va. Code 55-13-1

<u>et seq.</u>  <u>See</u> Compl., ECF No. 1 ("Westfield Compl.").  The court

has diversity jurisdiction over this matter pursuant to 28

U.S.C. § 1332.  Defendants Dr. Steven Matulis and his former

employer, Charleston Gastroenterology Associates, PLLC

("Charleston Gastroenterology"), have been sued in the Circuit

Court of Kanawha County, West Virginia by several former female patients.[1]  Ten patients are joined here as claimant defendants ("claimants"): T.W., K.H., T.F., J.L., A.G., B.D., A.H., A.M., C.S. and J.W.  See id. ¶¶ 4-13, 16.  These claimants are identified by their initials for privacy reasons.

The state court lawsuits arise from medical procedures (e.g., colonoscopies) that Dr. Matulis performed on the claimants while each of them was anesthetized.  See id. ¶ 17. The lawsuits allege that Dr. Matulis sexually assaulted the claimants while they were under anesthesia and incapacitated, and/or that Dr. Matulis performed the colonoscopies while distracted or impaired due to his alleged proclivity for sexually assaulting unconscious female patients, such that the colonoscopies were not medically reliable or failed to meet the standard of care owed by a doctor to a patient.  See id.

The facts giving rise to each alleged instance of misconduct vary from claimant to claimant.  One or more of the claimants allege that an employee or employees of the Charleston

_____

[1] Some state court lawsuits also list Day Surgery LLC (d/b/a Day Surgery Center LLC) as a co-defendant alongside Dr. Matulis and Charleston Gastroenterology.  See, e.g., J.L.'s Compl., ECF No., 113-3, Ex. C; J.W.'s Compl., ECF No. 134-1, Ex. 1.  Claims against Day Surgery LLC are not reviewed in this opinion because Day Surgery LLC is not a named party in the action before this court, and the insurance policy under consideration has not been argued to apply to Day Surgery LLC.

Area Medical Center, Memorial Division, where their medical procedures were performed, witnessed the sexual assault by Dr. Matulis. See id. ¶ 18. One or more of the claimants also allege that the employee or employees who witnessed the sexual assault reported the incident to the hospital administration. See id. ¶ 19.

The specific claims against Dr. Matulis include battery, tort of outrage, intentional and negligent infliction of emotional distress, false detention, invasion of privacy, and medical negligence. See, e.g., Pl.'s Mot. Summ. J., ECF No. 113-1 to ECF No. 113-11, Exs. A to K. The claims against Charleston Gastroenterology include negligent and reckless retention, intentional and negligent infliction of emotional distress, negligent supervision, invasion of privacy, and vicarious liability for Dr. Matulis's acts. See, e.g., id. In addition, certain claimants assert class claims on behalf of other female patients of Dr. Matulis who may not know whether they were sexually assaulted or otherwise physically injured during a medical procedure performed by Dr. Matulis. See, e.g., T.F.'s Compl., ECF No. 113-10, Ex. J, ¶¶ 36–49. Several claimants have not yet initiated lawsuits in state court but have filed a "Notice of Claim" to notify Dr. Matulis and Charleston Gastroenterology of a potential medical malpractice

suit, as required by West Virginia Code § 55-7B-6(f).  See, e.g., Pl.'s Mot. Summ. J., ECF 113-5 to ECF 113-8, Exs. E to H. These Notices of Claim contain similar factual allegations found in the complaints filed in state court.

Westfield provided a general commercial liability insurance policy, Policy Number BOP 3157951 ("the Policy"), to Charleston Gastroenterology for coverage from March 21, 2015 through March 21, 2016.  Westfield Compl., at 4-5.  All the relevant incidents occurred during the time period of the Policy.[2]  See id.  The Policy provides liability coverage to "pay those sums that the insured becomes legally obligated to pay as

---

[2] The court notes that claimant A.G.'s claims arise from a February 2015 incident with Dr. Matulis.  A.G.'s Compl., ECF No. 113-11, Ex. K, ¶¶ 7-12; A.G.'s Resp., ECF No. 123, at 2, 4. This falls before the period of coverage of the Policy.  A.G. raises the timing issue to oppose summary judgment by explaining that "[i]t is not clear why [her] underlying complaint is even included in Westfield's declaratory judgment action."  See A.G.'s Resp., ECF No. 123, at 4.  A.G. argues against Westfield's "one-size-fits-all approach" to the claimants' claims, but she does not raise her timing issue as the grounds for a motion to dismiss.  See id.  Westfield does not object to including A.G. in this case because it alleges that it provided a policy to Charleston Gastroenterology for March 21, 2014 through March 21, 2015 with identical language to the Policy here.  See Combined Reply, at 15-16.  The court finds that the relevant sections on liability coverage in the two policies are identical.  See Policy, at 71-87; Combined Reply, ECF 124-1, Ex. A, at 87-103.  The policy numbers of the two are also identical: Policy Number BOP 3157951.  See Policy, at 1; Combined Reply, ECF 124-1, Ex. A, at 1.  The results reached in this opinion would seem to be controlling for A.G.'s claims as reviewed by the court.

damages because of" the following: (1) "bodily injury," (2) "property damage," or (3) "personal and advertising injury." Pl.'s Mot. Summ. J., ECF 113-12, Ex. L ("Policy"), at 71 (Section II.A.1.a). The Policy also provides that Westfield has "the right and duty to defend the insured against any 'suit' seeking those damages." Id. The Policy covers both Charleston Gastroenterology and Dr. Matulis as an employee of Charleston Gastroenterology "for acts within the scope of [his] employment by [Charleston Gastroenterology] or while performing duties related to the conduct of [Charleston Gastroenterology's] business." See id. at 82 (Section II.C.2.a).[3]

The Policy applies to "bodily injury" and "property damage" only if three requirements are satisfied, two of which are particularly pertinent here: (1) the "bodily injury" or "property damage" is "caused by an 'occurrence' that takes place in the 'coverage territory,'" and (2) the "bodily injury" or

---

[3] It is undisputed that the Policy covers both Charleston Gastroenterology and Dr. Matulis for the claims alleged by the claimants.

"property damage" "occurs during the policy period."[4]  Id. at 71

(Section II.A.1.b(1).  "Bodily injury" is defined as "bodily

injury, sickness or disease sustained by a person, including

death."  Id. at 85 (Section II.F.3).  "Occurrence" is defined as

"an accident, including continuous or repeated exposure to

substantially the same general harmful conditions."  Id. at 86

(Section II.F.13).  The claimants did not allege property damage

claims in the state court lawsuits or the Notices of Claim, so

the court does not review further the relevant sections of the

Policy on "property damage."

The Policy also covers "'personal and advertising

injury' caused by an offense" arising out of Charleston

Gastroenterology's business only if the offense was committed in

the "coverage territory" during the Policy period.  Id. at 72

(Section II.A.1.b(2)).  "Personal and advertising injury" is

defined as "injury, including consequential 'bodily injury'"

arising out of one or more enumerated offenses, including, inter

---

[4] The third requirement is that no entity covered under the
Policy, or an employee of such entity authorized to give or
receive notice of an "occurrence" or claim, knew that the
"bodily injury" or "property damage" "had occurred, in whole or
in part" prior to the policy period.  Policy, at 71 (Section
II.A.1.b(1)) (emphasis added).  If the entity or employee knew
that the "bodily injury" or "property damage" occurred prior to
the policy, then "any continuation, change or resumption of such
'bodily injury' or 'property damages' during or after the policy
period will be deemed to have been known before the policy
period."  Id. (Section II.A.1.b(1)(c)).

alia: "[f]alse arrest, detention or imprisonment," "[o]ral or written publication, in any manner, of material that slanders or libels a person," and "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." See id. at 87 (Section II.F.14) (emphasis added).

The Policy limits coverage based on three relevant exclusions. First, the "Expected or Intended Injury" exclusion applies to "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured." Id. at 74 (Section II.B.1.a). Second, the "Professional Services" exclusion applies to "'[b]odily injury', 'property damage' or 'personal and advertising injury' caused by the rendering or failure to render any professional service." Id. at 76 (Section II.B.1.j). "Professional services" include, inter alia, "[m]edical, surgical, dental, X-ray or nursing services treatment, advice or instruction," and "[a]ny health or therapeutic service treatment, advice or instruction." Id. (Section II.B.1.j(4)-(5)). The exclusion notably states that:

> This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering or failure to render of any professional service.

Id. at 78 (Section II.B.1.j) (emphasis added). Third and final, the "Personal and Advertising Injury" exclusion applies, inter alia, to any such injury "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" Id. at 79 (Section II.B.1.p(1)). Pursuant to the Policy, Westfield will not pay medical expenses for "bodily injury" excluded from coverage. See id. at 79 (Section II.B.2.g).

Based on the Policy, Westfield filed this case seeking a declaratory judgment that the Policy does not provide coverage for the defense or indemnification of any of the claims asserted by the claimants in state court in connection with the alleged sexual assault and/or the provision of inadequate medical care by Dr. Matulis. See Westfield Compl., at 15. Westfield also asserts that the Policy does not provide coverage for the defense or indemnification of any future related claims that might be filed against Dr. Matulis or Charleston Gastroenterology, including any class actions that may be certified in any of the underlying state civil actions. See id. Finally, based on the lack of coverage, Westfield asserts that it does not have a duty to defend or indemnify Dr. Matulis or

Charleston Gastroenterology in the existing state civil actions or in related actions that might be brought. _See_ _id._ at 16.

Westfield filed the motion for summary judgment and a memorandum of law in support on November 30, 2017. _See_ Pl.'s Mot. Summ. J., ECF 113 ("Motion"); Pl.'s Memo. Supp. Mot. Summ. J., ECF 114 ("Memo"). Four claimants -- J.L., K.H., J.W., and A.G. -- filed opposition briefs between December 14, 2017 and December 20, 2017. _See_ J.L.'s Resp., ECF No. 120 ("J.L.'s Resp."); K.H.'s Memo. Oppos., ECF No. 121 ("K.H.'s Resp."); J.W.'s Resp., ECF No. 122 ("J.W.'s Resp."); A.G.'s Resp., ECF No. 123 ("A.G.'s Resp."). Westfield filed a combined reply on December 21, 2017 to address the opposition briefs collectively. _See_ Pl.'s Combined Reply, ECF No. 124 ("Combined Reply").

It is undisputed that both Dr. Matulis and Charleston Gastroenterology are insured under the Policy and that the claims arose from the coverage territory during the Policy period. However, neither Dr. Matulis nor Charleston Gastroenterology has appeared in this action to oppose Westfield's position. Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, Westfield filed a motion for the entry of default judgment against Dr. Matulis and Charleston Gastroenterology on October 26, 2017. _See_ Pl.'s Mot. Default J., ECF No. 95. The court granted the motion and entered

default judgment against Dr. Matulis and Charleston Gastroenterology on February 14, 2018.  <u>See</u> Order, ECF No. 128.

Soon after, claimant J.W. filed a civil action in the Circuit Court of Kanawha County on March 1, 2018 (civil case no. 18-c-205).  <u>See</u> J.W.'s Compl., ECF No. 134-1, Ex. 1.  On March 8, 2018, J.W. filed a motion for leave to amend her answer in this case to assert a counterclaim for declaratory judgment against Westfield, pursuant to Rule 15(a)(2) of the Federal Fules of Civil Procedure and Rule 16.1(f)(1) of the Local Rules of Civil Procedure for the United States District Court for the Southern District of West Virginia.  <u>See</u> Def. J.W.'s Mot. Leave Am. Answer, ECF No. 134.  J.W.'s motion seeks a declaratory judgment finding that the Policy "provides coverage for some claims asserted by J.W." against Dr. Matulis and Charleston Gastroenterology in her state court lawsuit.  Def. J.W.'s Am. Answer, ECF No. 134-2, Ex. 2, at 10.

## II.  Legal Standard

A.  <u>Summary judgment.</u>

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are

those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

B.    <u>Leave to amend answer.</u>

Under Rule 15(a) of the Federal Rules of Civil Procedure, the court "should freely give leave [to amend] when justice so requires."  Alternatively, under Rule 15(d) of the Federal Rules of Civil Procedure, the court "may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Rule 16(b) of the Federal Rules of Civil Procedure directs that "a schedule may be modified only for good cause."  Similarly, Rule 16(f)(1) of the Local Rules of Civil Procedure for the Southern District of West Virginia permits amendments to pleadings "for good cause."

J.W.'s motion for leave to amend her answer to assert a counterclaim for declaratory judgment against Westfield is based on J.W.'s filed complaint in the Circuit Court of Kanawha County, which she filed well after briefings had completed on Westfield's motion for summary judgment.  <u>See</u> J.W.'s Compl., ECF No. 134-1, Ex. 1.  The court takes notice of A.G.'s filed complaint in state court.  The claims that J.W. alleges in her complaint are fully considered by the court in this opinion as

11

they are identical to claims alleged by other claimants, including violation of the right of privacy; false detention; medical negligence; negligent hiring, retention, and supervision; negligent infliction of emotional distress; and battery. See id. ¶¶ 14–31. Inasmuch as these claims are already considered, leave to amend on this basis is futile and the court does not find good cause to allow the amendment.

J.W.'s complaint also raises an additional claim from J.W.'s husband, alleging that the husband "has been deprived of the consortium, society and comfort of his wife" such that he has suffered and will continue to suffer mental anguish. Id. ¶ 33. J.W. listed her husband as a potential claimant in her Notice of Claims against Dr. Matulis and Charleston Gastroenterology. See J.W.'s Notice of Claim, ECF 115-1, Ex. M (against Dr. Matulis); J.W.'s Notice of Claim, ECF 115-2, Ex. N (against Charleston Gastroenterology). However, the listing of this additional "claimant" does not change the court's analysis or conclusion regarding summary judgment because the husband's claim arises from the same conduct as J.W.'s claim.

## III. Discussion

In cases grounded in diversity jurisdiction, "federal courts are to apply the substantive law the State in which they are sitting would apply if the case had originated in a State

court."  Stonehocker v. Gen. Motors Corp., 587 F.2d 151, 154

(4th Cir. 1978) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64,

78 (1938)).  Under West Virginia law, "[d]etermination of the

proper coverage of an insurance contract when the facts are not

in dispute is a question of law."  Syl. Pt. 1, Tennant v.

Smallwood, 568 S.E.2d 10, 11 (W. Va. 2002).

　　　　Language in an insurance policy should be given its

"plain, ordinary meaning."  Syl. Pt. 8, Cherrington v. Erie Ins.

Prop. & Cas. Co., 745 S.E.2d 508, 511 (W. Va. 2013) (citation

omitted).  "The interpretation of an insurance contract,

including the question of whether the contract is ambiguous, is

a legal determination . . . ."  Syl. Pt. 2, Riffe v. Home

Finders Assocs., Inc., 517 S.E.2d 313, 314 (W. Va. 1999); see

also Syl. Pt. 4, W. Virginia Fire & Cas. Co. v. Stanley, 602

S.E.2d 483, 486 (W. Va. 2004) ("The question as to whether a

contract is ambiguous is a question of law to be determined by

the court.").  "Where the provisions of an insurance policy

contract are clear and unambiguous they are not subject to

judicial construction or interpretation, but full effect will be

given to the plain meaning intended."  Syl. Pt. 1, Christopher

v. U.S. Life Ins. Co. in City of New York, 116 S.E.2d 864, 864

(W. Va. 1960); see also Glen Falls Ins. Co v. Smith, 617 S.E.2d

760, 767-68 (W. Va. 2005).  However, an insurance contract is

ambiguous if "reasonable people can differ about the meaning." Syl. Pt. 1, D'Annunzio v. Sec.-Connecticut Life Ins. Co., 410 S.E.2d 275, 276 (W. Va. 1991). All ambiguities are construed in favor of the insured. Id.; see also Horace Mann Ins. Co. v. Leeber, 376 S.E.2d 581, 584 (W. Va. 1988) (". . . any ambiguity in the language of an insurance policy is to be construed liberally in favor of the insured."). "An insurance policy should never be interpreted so as to create an absurd result, but instead should receive a reasonable interpretation, consistent with the intent of the parties." Syl. Pt. 2, D'Annunzio, 410 S.E.2d at 276.

Liability insurance under West Virginia law creates two duties for the insurer: a duty to defend and a duty to provide coverage (i.e., to indemnify). See Aetna Cas. & Sur. Co. v. Pitrolo, 342 S.E.2d 156, 160 (W. Va. 1986). Generally, an insurer's duty to defend is broader than the duty to indemnify. Leeber, 376 S.E.2d at 584; Donnelly v. Transportation Ins. Co., 589 F.2d 761, 765 (4th Cir. 1978). An insurer must defend its insured "if the claim stated in the underlying complaint could, without amendment, impose liability for risks the policy covers." Bowyer v. Hi-Lad, Inc., 609 S.E.2d 895, 912 (W. Va. 2004); see also Pitrolo, 342 S.E.2d at 160 ("As a general rule, an insurer's duty to defend is tested

by whether the allegations in the plaintiff's complaint are
reasonably susceptible of an interpretation that the claim may
be covered by the terms of the insurance policy."). An insurer
must look beyond the bare allegations contained in the pleadings
and "conduct a reasonable inquiry into the facts in order to
ascertain whether the claims asserted may come within the scope
of the coverage that the insurer is obligated to provide." Syl.
Pt. 6, Farmers & Mechs. Mut. Ins. Co. v. Cook, 557 S.E.2d 801,
803 (W. Va. 2001) (citation omitted). For the duty to defend to
arise, "[t]here is no requirement that the facts alleged in the
complaint specifically and unequivocally make out a claim within
the coverage." Pitrolo, 342 S.E.2d at 160 (citation omitted);
see also Leeber, 376 S.E.2d at 584. An insurer must defend all
the claims "[i]f part of the claims against an insured fall
within the coverage of a liability insurance policy and part do
not." Leeber, 376 S.E.2d at 584 (citing Donnelly, 589 F.2d at
765). However, the insurer is not required to defend a case
against the insured "if the alleged conduct is entirely foreign
to the risk insured against." Id.

A court must liberally construe any questions
regarding an insurer's duty to defend in favor of the insured.
See Pitrolo, 342 S.E.2d at 160. Furthermore, "[w]here the
policy language involved is exclusionary, it will be strictly

construed against the insurer in order that the purpose of providing indemnity not be defeated." Syl. Pt. 4, <u>Cook</u>, 557 S.E.2d at 803 (citation omitted).

A. <u>Claims for the intentional sexual misconduct of Dr. Matulis.</u>

Several claimants allege the intentional tort of battery for having suffered bodily injury as a result of being sexually assaulted by Dr. Matulis during their respective medical procedures.[5] <u>See,</u> <u>e.g.</u>, T.W.'s Am. Compl., ECF No. 113-2, Ex. B, ¶¶ 5–12; J.L.'s Compl., ECF No. 113-3, Ex. C, ¶¶ 19–23; K.H.'s Compl., ECF No. 113-4, Ex. D, ¶ 8; B.D.'s Notice of Claim, ECF No. 113-6, Ex. F, at 2. For these claims to be covered under the Policy, the claims of bodily injury must have been caused by an "occurrence" that took place in the "coverage territory," during the period of the Policy coverage, and was not known to have occurred before the Policy period. <u>See</u> Policy, at 71 (Section II.A.1.b(1)). It is undisputed that the claims of bodily injury took place in the "coverage territory" during the Policy period and were not known before the Policy

---

[5] J.L. argues that "bodily injury" is a vague term in the Policy and that it should be construed against the insurer. J.L.'s Resp., at 4. However, there is no dispute that the claimants suffered bodily injury in these cases.

period.  The court therefore considers whether the conduct

giving rise to the claims is an "occurrence."

        The Policy defines an "occurrence" as "an accident,

including continuous or repeated exposure to substantially the

same general harmful conditions."  Id. at 86 (Section II.F.13).

The Policy does not define "accident."  In another case in which

the insurance policy at issue had the same definition of

"occurrence," the Supreme Court of Appeals of West Virginia

noted the following definition for "accident":

> [a]n 'accident' generally means an unusual,
> unexpected and unforeseen event.... An accident
> is never present when a deliberate act is
> performed unless some additional unexpected,
> independent and unforeseen happening occurs which
> produces the damage.... To be an accident, both
> the means and the result must be unforeseen,
> involuntary, unexpected, and unusual.

State Bancorp, Inc. v. U.S. Fid. & Guar. Ins. Co., 483 S.E.2d

228, 234 (W. Va. 1997) (per curiam) (citations omitted)

(alteration in original); see also Columbia Cas. Co. v.

Westfield Ins. Co., 617 S.E.2d 797, 800 (W. Va. 2005) (applying

this definition of "accident").  "[T]he definition of an

'occurrence' does not include actions which are intended by the

insured."  State Bancorp, 483 S.E.2d at 235 (emphasis in

original).  Based on these definitions, the court in State

Bancorp found that the intentional acts of the insured -- tort

of outrage, tort of civil conspiracy, and violation of state

banking laws -- were not "accidents" and therefore were not covered under the insurance policy.  See id. at 236.

With respect to sexual misconduct, the Supreme Court of Appeals has also found that "[i]n an insurance liability policy, a claim based on sexual harassment does not come within the definition of 'occurrence,' which is defined as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'"  Syl. Pt. 2, Smith v. Animal Urgent Care, Inc., 542 S.E.2d 827, 828 (W. Va. 2000).

"Under an intentional acts exclusion, a policyholder may be denied coverage only if the policyholder (1) committed an intentional act and (2) expected or intended the specific resulting damage."  Syl. Pt. 7, Cook, 557 S.E.2d at 803 (emphasis in original).  With regard to sexual misconduct, the Supreme Court of Appeals has held that:

> There is neither a duty to defend an insured in an action for, nor a duty to pay for, damages allegedly caused by the sexual misconduct of an insured, when the liability insurance policy contains a so-called "intentional injury" exclusion. In such a case the intent of an insured to cause some injury will be inferred as a matter of law.

Syl., Leeber, 376 S.E.2d at 582.  The Supreme Court of Appeals echoed this holding in Dotts v. Taressa J.A. to conclude that

"language in a motor vehicle liability insurance policy defining 'accident' to include 'bodily injury or property damage the insured neither expected or intended' is generally designed to exclude coverage for an intentional tort such as sexual assault."  390 S.E.2d 568, 570–71 (W. Va. 1990).

Westfield contends that there is no coverage for allegations of sexual assault against Dr. Matulis or Charleston Gastroenterology because Dr. Matulis's acts were voluntary and intentional, and therefore they cannot be considered an accident.  See Memo, at 17–18.  Furthermore, Westfield asserts that the "Expected or Intended Injury" exclusion precludes coverage because such allegations of sexual misconduct fall squarely within the exclusion as recognized by the Supreme Court of Appeals in Leeber.  See id.  Claimants J.L., K.H., and J.W. argue in response that whether the "Expected or Intended Injury" exclusion applies hinges, not on whether Dr. Matulis intended the acts, but on whether the acts were an "occurrence" from the perspective of, or intended by, Charleston Gastroenterology and its other employees.  See J.L.'s Resp., at 4–5; K.H.'s Resp., at 2; J.W.'s Resp., at 11–12.

In Columbia Casualty Co. v. Westfield Insurance Co., the Supreme Court of Appeals considered the perspective from which to determine liability coverage for an "occurrence."  617

S.E.2d 797 (W. Va. 2005). The court considered whether the suicide deaths of two inmates housed in the county jail were "occurrences"[6] under the general liability insurance policy issued to the county commission. Id. at 798. The insurance company argued that the suicide deaths were not "occurrences" because "the suicidal person deliberately intended his or her own death." Id. at 799. The court articulated the following principle:

> In determining whether under a liability insurance policy an occurrence was or was not an "accident" —- or was or was not deliberate, intentional, expected, desired, or foreseen —- primary consideration, relevance, and weight should ordinarily be given to the perspective or standpoint of the insured whose coverage under the policy is at issue.

Id. at 797; see also Cherrington, 745 S.E.2d at 520 (applying this principle). The court found that "from the perspective or standpoint of the insured [i.e., the county commission] . . . the inmates' deaths by suicide were not deliberate, intentional, expected, desired, or foreseen by the [the insured] . . . . [I]t must be concluded that the deaths were 'accidents' and thus 'occurrences' under the policy language in question." Columbia Cas. Co., 617 S.E.2d at 801.

---

[6] The insurance policy used the same definition for "occurrence" as the Policy here. See Columbia Cas. Co., 617 S.E.2d at 799.

The language of "expected or intended from the standpoint of the insured" is already part of the "Expected or Intended Injury" exclusion of the Policy.  The court in <u>Columbia Casualty</u> merely distinguished the standpoint of the insured from those not covered by the insurance policy (i.e., the inmates).  The instant case is analogous to <u>Smith</u> in which Animal Urgent Care and one of its employees, Dr. Yurko, were both insured under the same general commercial liability policy.  542 S.E.2d at 828.  Another employee, Ms. Smith, alleged that Dr. Yurko sexually harassed her, and she consequently filed suit against both Animal Urgent Care and Dr. Yurko.  <u>Id.</u>  The court held that there was no duty on the part of the insurance company to defend or indemnify Animal Urgent Care or Dr. Yurko because Dr. Yurko's sexual misconduct was deemed not to have been an "occurrence" and fell within the insurance policy's intentional acts exclusion, whereunder the policy provided that "[t]his insurance does not apply to . . . '[b]odily injury' . . . expected or intended from the standpoint of the insured."  <u>See</u> <u>id.</u> at 831–34.

Similar to the instant case, the Supreme Court of Appeals in <u>Smith</u> was presented with a circumstance in which the sexual misconduct of one insured, Dr. Yurko, was surely not intended from the standpoint of the other insured, Animal Urgent

Care.  The court did not parse the standpoints of the various insureds as the claimants here now urge the court to do.  The court reviewed the conduct of the insured actor who committed the offense and found that it was not accidental and therefore not an "occurrence."  Thus, there was no coverage for any insured, notwithstanding the allegation of negligence on the part of the employer, Animal Urgent Care.  Here, intentional assaults are the crux of the matter.  Applying the claimants' reading of "from the standpoint of the insured" now to include all insured entities under the Policy would produce an absurd result.  <u>See</u> Syl. Pt. 2, <u>D'Annunzio</u>, 410 S.E.2d at 276 (". . . an insurance policy should never be interpreted so as to create an absurd result . . . .").

Based on the foregoing, the claims of sexual misconduct on the part of Dr. Matulis are not covered under the Policy as against Dr. Matulis or Charleston Gastroenterology.

**B.    <u>Claims for other intentional torts.</u>**

Several claimants allege other intentional torts against Dr. Matulis and Charleston Gastroenterology, including

tort of outrage,[7] intentional and negligent infliction of emotional distress, false detention, and invasion of privacy. Unlike the allegations of sexual assault, these torts did not result in bodily injury. J.L., T.W., and J.W. allege that they suffered emotional distress as a result of Dr. Matulis and Charleston Gastroenterology's intentional or reckless acts. See, e.g., T.W.'s Am. Compl., ECF No. 113-2, Ex. B, ¶ 20; J.L.'s Compl., ECF No. 113-3, Ex. C, ¶¶ 42-46; J.W.'s Compl., ECF No. 134-1, Ex. 1, ¶¶ 27-28. J.W. alleges that Dr. Matulis and Charleston Gastroenterology improperly detained her or contributed to her detention "for a purpose unrelated to a professional service, medical, surgery procedure, treatment, or healthcare."[8] Id. ¶ 20. Similarly, J.L. argues that her pleadings "can be interpreted to include false detention" and that she believes Dr. Matulis violated her right to privacy by making an oral publication about her body while she was under anesthesia. J.L.'s Resp., at 5-6. J.L.'s complaint does not

---

[7] Under West Virginia law, the tort of outrage is also known as intentional infliction of emotional distress. See Camden-Clark Mem'l Hosp. Corp. v. Tuan Nguyen, 807 S.E.2d 747, 753 n.15 (W. Va. 2017); Whitehair v. Highland Memory Gardens, Inc., 327 S.E.2d 438, 440 (W. Va. 1985).

[8] In J.W.'s response, she argues that the court does not have enough facts to determine that claims she might potentially bring, such as slander or libel, would not be covered by the Policy. J.W.'s Resp., ECF No. 122, at 9. The court, however, addresses the claims J.W. asserts in her complaint rather than hypothetical claims raised in J.W.'s response.

expressly include these allegations or causes of action. <u>See</u> J.L.'s Compl., ECF No. 113-3, Ex. C.

J.W. also asserts in her lawsuit that the defendants did not inform the authorities or herself about Dr. Matulis's "improper and negligent acts," but instead provided her and the public with inaccurate information, which violated her right to privacy. J.W.'s Compl., ECF No. 134-1, Ex. 1, ¶¶ 14-17, 27-28.[9] Although A.G. is uncertain as to whether Dr. Matulis assaulted her during her procedure, she claims that Dr. Matulis invaded her privacy inasmuch as she did not consent to have medical procedures performed by a physician with professional impairments. A.G.'s Compl., ECF No. 113-11, Ex. K, ¶¶ 24-26. A.G. also asserts claims in her state court case on behalf of a potential class of female patients who may have suffered non-physical harm as a result of Dr. Matulis's conduct. <u>Id.</u> ¶¶ 33-46; A.G.'s Resp., at 9-10.

Westfield contends that since these claims involve either the intentional conduct of Dr. Matulis or the rendering of professional services, they are exempt from coverage under the Policy exclusions. <u>See</u> Combined Reply, at 14-15; Pl.'s

---

[9] J.W. attached her state court complaint to her motion for leave to amend her answer to include a counterclaim for declaratory judgment. <u>See</u> J.W.'s Compl., ECF No. 134-1, Ex. 1.

Resp. J.W.'s Mot. Leave Am. Answer, ECF No. 136, at 6–7.  In

distinguishing "bodily injury" from "personal injury," the

Supreme Court of Appeals has held that:

> It is well settled in insurance law that "bodily
> injury" and "personal injury" are not synonyms and
> that these phrases have two distinct definitions. The
> term "personal injury" is broader and includes not
> only physical injury but also any affront or insult to
> the reputation or sensibilities of a person. "Bodily
> injury," by comparison, is a narrow term and
> encompasses only physical injuries to the body and the
> consequences thereof.

Smith, 542 S.E.2d at 831 (internal quotations and citations

omitted).  Since these intentional torts do not involve bodily

injury, the "Expected or Intended Injury" exclusion is not

applicable.  The court instead interprets these claims to be

alleging "personal injury" within the category of "personal

and advertising injury."

The "Professional Services" exclusion of the Policy

excludes "personal injuries" from coverage that are "caused by

the rendering or failure to render any professional service."

See Policy, at 76, 78.  "The term 'professional services'

contained in a commercial general liability policy, when not

otherwise specifically defined, denotes those services rendered

by someone with particularized knowledge or skill in his or her

chosen field."  Syl. Pt. 1, Boggs v. Camden-Clark Mem'l Hosp.

Corp., 693 S.E.2d 53, 55 (W. Va. 2010).  The Policy lists

several types of "professional services," including "[m]edical, surgical, dental, X-ray or nursing services treatment, advice or instruction." Id. at 76. The colonoscopies and other medical procedures that Dr. Matulis performed on the claimants fall squarely within "[m]edical, surgical . . . services." See id.

The "Personal and Advertising Injury" exclusion of the Policy excludes coverage for "personal injuries" "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" Id. at 79 (emphasis added).

A.G. supports her claim that coverage for the personal injury of invasion of privacy not grounded in sexual misconduct is covered under the Policy by citing Tackett v. American Motorists Insurance Co., a case before the Supreme Court of Appeals. See A.G.'s Resp., at 9–10 (citing 584 S.E.2d 158 (W. Va. 2003)). In Tackett, an employee of the retail store Gadzooks, Inc. sexually harassed a young woman while she was shopping at the store. 584 S.E.2d at 160–61. Gadzooks was insured under a commercial general liability policy. Id. The allegations in the woman's complaint did not assert "bodily injury," which would have been excluded from coverage under the intentional act exclusion of the policy, but rather asserted claims for "personal injury," which the Supreme Court of Appeals

found were not excluded from coverage.[10]  Id. at 166–68.  A.G.'s claims of emotional distress caused by invasions of privacy not grounded in sexual misconduct are based on the medical procedures performed by the "impaired" Dr. Matulis.  These claims are clearly within the "Professional Services" exclusion.

Similarly, the false detention claims are "personal injuries" caused by the false detention of claimants undergoing professional medical services.  These claims are also excluded from coverage under the "Professional Services" exclusion.  See, e.g., J.L.'s Compl., ECF No., 113-3, Ex. C, ¶ 18 ("On October 16, 2015, Plaintiff presented to Day Surgery Center for an esophagogastroduodenoscopy procedure to be performed by Dr. Matulis . . . .") (emphasis added); J.W.'s Compl., ECF No. 134-1, Ex. 1, ¶ 6 ("In May, 2015, the Plaintiff was a patient of Dr. Matulis . . . . She was admitted as an outpatient to the Day Surgery Center for a routine colonoscopy.") (emphasis added).

In considering the invasion of privacy claims made by T.W., J.L. and J.W., all of whom allege to have been assaulted

---

[10] The only pertinent exclusion for personal injury in the Tackett policy concerned slander: "[t]his insurance does not apply to . . . '[p]ersonal injury' . . . [a]rising out of oral . . . publication of material, if done by or at the direction of the insured with knowledge of its falsity."  584 S.E.2d at 167 (alterations in original).  The Policy in the instant case has a somewhat similar exclusion for slander.  See Policy, at 79 (Section II.B.1.p(2)).

by Dr. Matulis, the court considers the decision of the United
States District Court for the Northern District of West Virginia
in Erie Insurance Property & Casualty Company, Inc. v. Edmond.
785 F. Supp. 2d 561 (N.D.W. Va. 2011).  In Edmond, an insurance
provider filed a declaratory judgment action to determine if
there were a duty to defend the insured defendants in the
underlying state court action.  Id. at 563.  The state court
action alleged certain torts including, inter alia, intentional
or negligent infliction of emotional distress, false
imprisonment, invasion of privacy, and creating a hostile work
environment through sexual harassment.  Id.  The insurance
policy included an exclusion for "Knowing Violation of Rights of
Another," in which coverage is not provided for "'[p]ersonal and
advertising injury' caused by or at the direction of the insured
with the knowledge that the act would violate the rights of
another and would inflict 'personal and advertising injury.'"
Id. at 568.  The court noted that:

> Importantly, under West Virginia law, a
> defendant's intent to cause injury to another
> "will be implied as a matter of law in instances
> of sexual misconduct," including "allegations of
> sexual harassment." . . . Thus, if the claims of
> "false imprisonment" and "invasion of privacy"
> alleged in the underlying complaint are
> predicated on instances of sexual misconduct or
> harassment by Mr. Edmond, the "knowing violation
> of rights of another" exclusion would apply and
> extinguish Erie's duty to defend.

Id. at 568-69 (quoting Smith, 542 S.E.2d at 832-33).
Ultimately, the court found that "[t]he allegations of 'false
imprisonment' and 'invasion of privacy' [were] sufficiently
based on Mr. Edmond's alleged sexual misconduct and harassment
to imply the fact that he acted intentionally and with knowledge
that his actions 'would violate the rights of another.'" Id. at
569.

The Edmond policy and the Policy here share the
identical definition for "personal and advertising injury." See
id. at 567; Policy, at 87 (Section II.F.14). The "Knowing
Violation of Rights of Another" exclusion in Edmond is also
identical to the first part of the "Personal and Advertising
Injury" exclusion in the Policy here. See Edmond, 785 F. Supp.
2d at 568; Policy, at 79 (Section II.B.1.p(1)). The allegations
in T.W., J.W. and J.L.'s pleadings demonstrate that their
invasion of privacy claims are rooted in Dr. Matulis's sexual
misconduct. See J.W.'s Compl., ECF No. 134-1, Ex. 1, ¶ 10
("Plaintiffs were contacted by law enforcement personnel and
were told that Dr. Matulis had engaged in . . . sexual
misconduct during the December 2015 surgical procedure.");
J.L.'s Compl. ECF No. 113-3, Ex. C, ¶ 20 ("Without her knowledge
or consent, and while Plaintiff was under anesthesia and
incapacitated, Defendant Dr. Matulis placed his hands upon her,

upon or inside her hospital gown, and pulled away her hospital gown for the purpose of ogling and/or fondling her breasts."); T.W.'s Am. Compl., ECF No. 113-2, Ex. B, ¶¶ 8-9 (asserting that during her colonoscopy, while she was under anesthesia and incapacitated, Dr. Matulis fondled her breasts and "used his fingers to repeatedly penetrate her vagina.").

The court finds that these invasion of privacy claims are "unambiguously root[ed] in [the insured's] alleged sexual misconduct" and infers intent to cause personal injury on the part of Dr. Matulis.[11] See Edmond, 785 F. Supp. 2d at 569. Accordingly, the "Personal and Advertising Injury" exclusion in the Policy applies to the invasion of privacy claims grounded in the sexual misconduct of Dr. Matulis and excludes coverage.

## C.    Claims of medical malpractice and medical negligence.

Several claimants either allege medical negligence or malpractice, or have submitted a "Notice of Claim" to notify Dr. Matulis and Charleston Gastroenterology that they failed to meet the standard of care owed to the claimants as medical patients. See, e.g., B.D.'s Notice of Claim, ECF No. 113-6, Ex. F, at 1-2; A.H.'s Notice of Claim, ECF No. 113-7, Ex. G, at 1-2; A.G.'s

---

[11] The same reasoning applies to support the exclusion of the false detention claims which the court has already found to be excluded from coverage of the Policy under the "Professional Services" exclusion.

Compl., ECF No. 113-11, Ex. K, ¶¶ 15–23.  A.G. specifically
contends that based on Dr. Matulis's impairment -- his
propensity to assault female patients while performing
colonoscopies -- she was injured because "she could not receive
a competent colonoscopy from Matulis due to his impairment."
A.G.'s Resp., at 6.

Claims alleging medical negligence clearly arise from
the doctor-patient relationship between the claimant and Dr.
Matulis.  As previously discussed, the "Professional Services"
exclusion in the Policy here applies to "bodily injury" and
"personal and advertising injury" "caused by the rendering or
failure to render any professional service," including
"[m]edical, surgical . . . services treatment, advice or
instruction."  Policy, at 76 (Section II.B.1.j(4)). This
exclusion even extends to claims of "negligence or other
wrongdoing in the supervision, hiring, employment, training or
monitoring of others" if the injury arose from the "rendering or
failure to render of any professional service."  See id. at 78.

Regardless of the title of the claim asserted against
Dr. Matulis or Charleston Gastroenterology, all claims sounding
in medical negligence (i.e., claims that Dr. Matulis did not
meet the standard of care required in performing colonoscopies
and related procedures) are excluded from coverage under the

Policy pursuant to the "Professional Services" exclusion. When considering "professional services" exclusions in commercial general liability policies, the Supreme Court of Appeals of West Virginia has noted that:

> The inclusion in a standard commercial general liability policy of language that excludes coverage for "professional liability" is specifically designed to shift the risk of liability for claims arising in connection with the performance of professional services away from the insurance carrier and onto the professional. Professionals wishing to insure themselves against the risk of liability in connection with the rendering of their professional services may opt to purchase separate insurance coverage, known as an errors and omissions policy.

Webster Cty. Solid Waste Auth. v. Brackenrich & Assocs., Inc., 617 S.E.2d 851, 858 (W. Va. 2005), overruled on other grounds by, Cherrington, 745 S.E.2d 508 (finding that defective workmanship causing bodily injury or property damage constitutes an "occurrence" under a commercial general liability policy). Therefore, any claims against Charleston Gastroenterology related to Dr. Matulis's alleged medical negligence or malpractice are also excluded from coverage under the Policy.

D. Claims against Charleston Gastroenterology sounding in negligence.

Some claimants allege claims against Charleston Gastroenterology for negligently supervising Dr. Matulis or for negligently retaining him after they allegedly became aware that he was sexually assaulting and/or harassing female patients.

<u>See</u> J.L.'s Resp., 2, 7–8; K.H's Resp., at 2; J.W.'s Resp., at 9–10; A.G.'s Resp., at 6–7; J.W.'s Compl., ECF No. 134-1, Ex. 1, ¶¶ 22–26.  Westfield contends that the "Professional Services" exclusion applies to each of these claims because they all arise out of a doctor-patient relationship between Dr. Matulis and the claimant in the performance of a medical procedure.  Memo, at 19.  Again, the Policy specifically states that:

> [The "Professional Services"] exclusion applies even if the claims allege <u>negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring</u> of others by an insured, if the "occurrence" which caused the "bodily injury" . . . or the offense which caused the "personal and advertising injury", <u>involved the rendering or failure to render of any professional service</u>.

Policy, at 78 (emphasis added).

Westfield further argues that the claimants' pleadings of negligence cannot create coverage under the Policy where it would not otherwise exist by virtue of an intentional act exclusion.  <u>Id.</u> at 19–20 (quoting <u>Smith</u>, 542 S.E.2d at 834 ("[T]he inclusion of negligence-type allegations in a complaint that is at its essence a sexual harassment claim will not prevent the operation of an 'intentional acts' exclusion contained in an insurance liability policy which is defined as excluding 'bodily injury' 'expected or intended from the standpoint of the insured.'")).

The responding claimants offer differing arguments in support of their contentions for coverage under the Policy for claims of negligent retention and supervision against Charleston Gastroenterology.  J.L. contends that she "clearly pleaded negligence counts separate from the actions of Matulis," J.L.'s Resp., at 8, and that "[c]ourts in West Virginia recognize negligent retention and supervision of an employee as an independent cause of action," id. at 7 (quoting Charleston Area Med. Ctr., Inc. v. Nat'l Union Fire Ins., No. 2:09-CV-00573, 2011 WL 2161534, at *6 (S.D.W. Va. June 1, 2011)).[12]  In particular, she argues that negligence on the part of other Charleston Gastroenterology employees pertaining to Charleston Gastroenterology's negligent retention or failure to supervise Matulis was not a medical service to which the "Professional Services" exclusion would apply.  See id. at 9-11.  Similarly, K.H. responds that she had specifically pled negligence causes of action against Charleston Gastroenterology, and that these claims are covered under the Policy.  See K.H.'s Resp., at 2.

---

[12] The court notes that J.L. cites other jurisdictions in support of her contention that negligent supervision should not be excluded under intentional acts or professional services exclusions because the supervision was independent from claims of sexual assault.  See J.L.'s Resp., at 7-8, 11-12.  However, the court is guided, as is required, by the laws of West Virginia.

J.W.'s response alleges that claims against Charleston
Gastroenterology for negligently retaining and/or supervising
Dr. Matulis might be covered under the Policy.  See J.W.'s
Resp., at 9–10, 12.  J.W. later formally included these claims
in her complaint in the Circuit Court of Kanawha County.  See
J.W.'s Compl., ECF No. 134-1, Ex. 1, ¶¶ 22–26.  She asserts that
these administrative failures, occurring before her doctor-
patient relationship began with Dr. Matulis, were the cause of
her injury.  See id. at 14.  Similarly, A.G. notes that Dr.
Matulis's impairment, and Charleston Gastroenterology's
knowledge thereof long preceded her doctor-patient relationship
with Dr. Matulis, and therefore the negligence occurred before
any medical service was provided.  See A.G.'s Resp., at 7.

     As an initial matter, the mere pleading of negligence
on the part of someone other than Dr. Matulis is not sufficient
under West Virginia law to invoke coverage of an insurance
policy with an intentional act exclusion.  In both Leeber and
Smith, in addition to the intentional torts alleged against the
insured accused of sexual misconduct, claims for negligence were
brought against the employer and co-insured of those
individuals.  See Leeber, 376 S.E.2d at 587; Smith, 542 S.E.2d
at 833–34.  The Supreme Court of Appeals of West Virginia stated
in Leeber that "allegations of 'negligence' in the complaint are

'a transparent attempt to trigger insurance coverage by characterizing allegations of [intentional] tortious conduct under the guise of 'negligent' activity." 376 S.E.2d at 587. As previously noted, the Smith court found that "the inclusion of negligence-type allegations in a complaint that is at its essence a sexual harassment claim will not prevent the operation of an 'intentional acts' exclusion." 542 S.E.2d at 834.

In further support of the holdings in Leeber and Smith, the Supreme Court of Appeals answered the following certified question from the United States District Court for the Northern District of West Virginia:

> Applying West Virginia public policy and rules of contract construction, do the unambiguous exclusions in [the insurer's] policy for bodily injury or property damage "which is expected or intended by any insured even if the actual injury or damage is different than expected or intended," and "arising out of any criminal act committed by or at the direction of any insured," and the unambiguous exclusion in Erie's policy for "bodily injury, property damage, or personal injury expected or intended by 'anyone we protect' ...," preclude liability coverage for insureds who did not commit any intentional or criminal act?

Am. Nat'l Prop. & Cas. Co. v. Clendenen, 793 S.E.2d 899, 902 (W. Va. 2016). In Clendenen, teenagers Sheila Eddy and Rachel Shoaf plotted and ultimately killed another teenager, Skylar Neese. Id. at 903. The victim's parents sued the killers' parents for,

<u>inter alia</u>, negligent supervision of their children.[13]  <u>Id.</u> 902–
03.  At the time of the murder, the killers' parents had
homeowner's insurance policies containing intentional injury
exclusions, not unlike the one in the Policy here. <u>See</u> <u>id.</u> at
903–04.

In <u>Clendenen</u>, the "focus of the intentional/criminal
acts exclusions is on the cause of the damages, not the
negligent supervision and negligent entrustment causes of
actions alleged against [the parents]."  <u>Id.</u> at 911.
Accordingly, the court held that "[o]ur case law makes it clear
that our public policy and rules of construction require courts
to apply intentional and criminal act exclusions to torts based
on intentional acts even when the claims are couched in terms of
negligence."  <u>Id.</u>  "[I]ntentional acts exclusions and exclusions
that remove a whole class of injuries from coverage are
consistent with the public policy of [West Virginia], even where
the result of the same is to deprive innocent victims of
compensation."  <u>Id.</u> (citing <u>Leeber</u>, 376 S.E.2d at 586–87).  In
light of the holding and reasoning of <u>Clendenen</u>, the claims in
the instant case that allege injury against Charleston

---

[13] The court notes that defendant Tara Clendenen was the guardian
or custodian of defendant Sheila Eddy.  <u>See</u> 793 S.E.2d at 903.
The court further notes that there is no allegation that the
parents or guardians knew or should have known that the children
were plotting to murder their friend.  <u>See</u> <u>id.</u>

Gastroenterology sounding in the negligent supervision or retention of Dr. Matulis arose from Dr. Matulis's own intentional acts. These claims are not covered under the Policy based on the "Expected or Intended Injury" exclusion.

The Supreme Court of Appeals has provided further basis to exclude the negligence claims raised by claimants against Charleston Gastroenterology. In West Virginia Fire & Casualty Co. v. Stanley, a liability insurer brought a declaratory judgment action seeking a declaration that the policy did not provide coverage for sexual abuse. 602 S.E.2d 483, 487 (W. Va. 2004). The insureds had a homeowner's insurance policy with an expected or intended injury exclusion: "We will not cover bodily injury or property damage that is expected or intended by a Covered Person." Id. The son of the insured was alleged to have sexually abused a relative who was also a minor. Id. In the underlying complaint, the plaintiffs (i.e., the assaulted minor and her parents) sued the insureds for negligent supervision of their son, alleging that the insureds knew that the son possessed sexual deviancies. Id. at 496-97. Importantly, the complaint alleged that the insureds' actions were "negligent," as well as "intentional, willful, wanton, malicious, reckless, and outrageous." Id.

The Supreme Court of Appeals noted that "[a]lthough the word 'negligent' is used in their allegations against [the insureds], intentional conduct is actually described." Id. at 497. The alleged "negligent" acts of the insureds were excluded under the intentional acts exclusion of the insurance policy because the court reasoned that:

> The usual meaning assigned to "wilful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences, amounting almost to willingness that they shall follow; and it has been said that this is indispensable.

Id. (emphasis in original).

Several of the claimants here directly allege that Charleston Gastroenterology knew of Dr. Matulis's sexual misconduct and did nothing about it. See, e.g., T.W. Am. Compl., ECF No. 113-2, Ex. B, ¶¶ 13-15; J.L.'s Compl., ECF No. 113-3, Ex. C, ¶¶ 24, 30-32, 49-53, 60-61; J.W.'s Compl., ECF No. 134-1, Ex. 1, ¶¶ 11, 13, 25. Those same claimants allege that the actions and inactions of Charleston Gastroenterology and Dr. Matulis were willful, wanton, and reckless. See T.W.'s Am. Compl., ECF No. 113-2, Ex. B, ¶ 19; J.L.'s Compl., ECF No. 113-3, Ex. C, ¶¶ 35, 57, 70; J.W.'s Compl., ECF No. 134-1, Ex. 1,

¶¶ 28, 32. Under the alleged facts that Charleston Gastroenterology actually, or at least constructively, knew that Dr. Matulis was sexually assaulting patients, Charleston Gastroenterology would have expected harm to befall the claimants. These claims alleging that actions or inactions of Charleston Gastroenterology were willful, even though they assert negligence, are therefore excluded from coverage under the "Expected or Intended Injury" exclusion.

Insofar as the claims for negligence against Charleston Gastroenterology allege personal, rather than bodily injury, the "Professional Services" exclusion exempts those claims from coverage as well.

J.L. and A.G. both cite <u>Charleston Area Medical Center</u> ("<u>CAMC</u>"), 2011 WL 2161534, to support their contention that the "Professional Services" exclusion does not preclude their negligence claims. <u>See</u> J.L.'s Resp., at 9–10; A.G.'s Resp., at 6–7. In <u>CAMC</u>, an employee of CAMC was alleged to have molested two female patients, resulting in both physical and emotional harm. 2011 WL 2161534, at *1. The relevant insurance policy provision was the "Medical and Professional Services Exclusion," which excluded coverage for claims "alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other

professional services or treatments for others."[14] Id. at *9.
The court found that the claims of sexual assault against the
employee were not excluded because they did not arise during any
treatment of the patients. Id. at *10. The claims were
"independent of any treatment or medical service that [the
employee] may have been providing" because the "employee was not
providing any type of medical or professional service when he
molested these women." Id.

In contrast, in the instant case, Dr. Matulis was
performing colonoscopies or other medical procedures when the
claimants suffered their harm. Regardless of when Charleston
Gastroenterology knew or should have known about Dr. Matulis's
alleged perversions, the triggering incidents that caused harm
to the claimants occurred during medical procedures performed by
Dr. Matulis. Those procedures are professional services. See
Syl. Pt. 1, Boggs, 693 S.E.2d at 62. The claims for personal
injury caused by the negligence of Charleston Gastroenterology
are therefore excluded from coverage under the Policy.

E.    Arguments for further discovery.

Claimants J.L., J.W., and A.G. assert that further
discovery is necessary before the court can reach a decision on

---

[14] There was no intentional act exclusion in the policy in
question in CAMC.  See 2016 WL 2161543, at *6–7.

declaratory judgment, in part, because facts are in dispute. J.L. contends that full discovery is necessary because coverage determinations "depend on the circumstances of when and what occurred, which requires discovery," and because "Westfield is arguing its favored version of disputed facts" in support of summary judgment. J.L.'s Resp., 12-13. J.W. argues that the lack of discovery inhibits her ability to argue fully against summary judgment. See J.W.'s Resp., at 13. A.G. avers that she needs discovery to unveil additional facts that will bolster her claims. See A.G.'s Resp., at 10.

Under West Virginia law, a trial court does not need to adjudicate the underlying facts in order to determine coverage. Stanley, 602 S.E.2d at 490. The general rule is that "an insurer's duty to defend is tested by whether the allegations in the plaintiff's complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." Pitrolo, 342 S.E.2d at 160. The Stanley court further emphasized that:

> . . . an insurer has a duty to defend an action
> against its insured only if the claim stated in
> the underlying complaint could, without
> amendment, impose liability for risks the policy
> covers. If the causes of action alleged in the
> plaintiff's complaint are entirely foreign to the
> risks covered by the insurance policy, then the
> insurance company is relieved of its duties under
> the policy.

602 S.E.2d at 490 (quoting <u>State Auto Mut. Ins. Co. v. Alpha</u>
<u>Eng'g Servs., Inc.</u>, 542 S.E.2d 876, 879 (W. Va. 2000)).

In this case, the claimants have either filed an
underlying complaint in the Circuit Court of Kanawha County,
submitted a Notice of Claim, or both.  Each complaint or Notice
of Claim outlines specific allegations of wrongdoing that were
considered by this court.  Discovery intended to determine the
truth or falsity of the claimants' allegations or to aid in
making additional allegations in the future are not necessary to
determine insurance policy coverage under West Virginia law.
Westfield filed a declaratory judgment action, in part, for the
purpose of avoiding the cost of full discovery if the
allegations in the complaint would not be covered by the Policy.
The court finds that further discovery is not necessary to
determine whether coverage exists in this matter.

F.   <u>Arguments for waiting for the state court decisions.</u>

Claimants A.G. and J.L. both allege that a decision as
to Westfield's duty to indemnify should be withheld until the
individual underlying state court actions and any unidentified
future actions have been fully litigated.  <u>See</u> J.L's Resp., at
3; A.G.'s Resp., at 7–8.  As previously noted, in declaratory
judgment proceedings, all that is necessary is for the insurer

to closely analyze the allegations in the pleadings.  <u>See</u>
<u>Bowyer</u>, 609 S.E.2d at 912; <u>Pitrolo</u>, 342 S.E.2d at 160.

A.G., alternatively, notes that the Southern District
of West Virginia has held that "in general, an insurer's duty to
indemnify cannot be determined until after the underlying suit
has been resolved."  <u>Camden-Clark Mem'l Hosp. Corp. v. St. Paul</u>
<u>Fire & Marine Ins. Co</u>, 717 F. Supp. 2d 529, 540 (S.D.W. Va.
2010) (quoting <u>Columbia Cas. Co. v. Ga. & Fla. RailNet Inc.</u>, 542
F.3d 106, 111 (5th Cir. 2008)).  A.G. further notes that the
Court of Appeals for the Fourth Circuit has stated that an
indemnification decision was premature where "there has been
neither a determination of liability nor a settlement in any of
the [state or federal court] actions pending against [the
parties]."  <u>A/S Ludwig Mowinckles Rederi v. Tidewater Constr.</u>
<u>Corp.</u>, 559 F.2d 928, 932 (4th Cir. 1977).  "An important factor
in considering ripeness is whether resolution of the tendered
issue is based upon events or determinations which may not occur
as anticipated."  <u>Id.</u>

Unlike the present case, the insurance policy in
<u>Camden-Clark</u> did not impose a duty to defend.  717 F. Supp. 2d
at 537.  The insured hospital only sought indemnification from
their insurance provider "for all the allegations asserted and
damages awarded against it in the underlying matter."  <u>Id.</u> at

534.  In addition, the Fifth Circuit decision quoted by the
court in Camden-Clark notes exceptions to the rule that
indemnification cannot be determined until after the underlying
suit has been resolved, including "when courts are determining
duty to defend and duty to indemnify issues at the same time,
and when the underlying policy does not provide for a duty to
defend but 'it is apparent before liability is resolved in the
underlying case that the policy cannot cover the claim.'"  Id.
at 540 n.11 (quoting Ga. & Fla. RailNet Inc., 542 F.3d at 111).

        The holding of Mowinckles is distinguishable because
it concerned a suit in admiralty in Virginia for insurance
coverage "for any liability which may be imposed on [a
shipowner] in the pending wrongful death or personal injury
actions" brought against the shipowner.  559 F.2d at 930.  The
Supreme Court of Appeals of West Virginia has also recognized
other opportunities to decide on declaratory judgment for
insurance coverage before the underlying civil lawsuit has
completed.  See, e.g., Leeber, 376 S.E.2d at 583-84 (considering
coverage based on a motion for judgment on the pleadings in a
declaratory judgment action before the underlying civil suit
completed).  "Declaratory judgment . . . provides a prompt means
of resolving policy coverage disputes so that the parties may
know in advance of the personal injury trial whether coverage

exists." __Christian v. Sizemore__, 383 S.E.2d 810, 814 (W. Va. 1989). Deciding coverage before the underlying case completes also ensures that an insurance provider fulfills its duty (or right) to defend an insured if such duty arises under the policy. Requiring an underlying case to complete would entirely defeat the purpose of reviewing policy coverage to determine a duty to defend.

Furthermore, the court has statutory authority to consider this declaratory judgment action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, which is one of the authorities under which this case was filed. Under the Declaratory Judgment Act, a federal district court, in a case or controversy otherwise within its jurisdiction, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); __see also__ __Penn-Am. Ins. Co. v. Coffey__, 368 F.3d 409, 412 (4th Cir. 2004) (recognizing federal jurisdiction to consider declaratory judgment actions involving the possible duty to defend or indemnify an insured). Declaratory judgments are routine and appropriate where "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue." __Coffey__, 368 F.3d at 412 (quoting

_Aetna Cas. & Sur. Co. v. Quarles_, 92 F.2d 321, 325 (4th Cir. 1937)).

The court finds that the circumstances of this case do not necessitate waiting for the underlying state actions to complete.  The case is fit for a determination on Westfield's declaratory judgment action.

## IV.   Conclusion

For the foregoing reasons, the court finds that Westfield Insurance Company Policy Number BOP 3157951, effective from March 21, 2015 through March 21, 2016, does not provide coverage for the defense or indemnification of Dr. Steven R. Matulis or Charleston Gastroenterology Associates, PLLC for those claims asserted by the claimants, identified by their initials as set forth in the case captioned above, in connection with the alleged sexual assault of the claimants and/or the provision of inadequate medical care to the claimants at any time, including any class or classes that may be certified in one or more civil actions by them.  Furthermore, Westfield has no duty to defend or indemnify Dr. Steven R. Matulis or Charleston Gastroenterology Associates, PLLC against those claims asserted by the aforementioned claimants in connection with the alleged sexual assault of the claimants and/or the provision of inadequate medical care to the claimants at any

time, including any class or classes that may be certified in one or more civil actions by them.  Accordingly, it is ORDERED that Westfield's motion for summary judgment be, and hereby is, granted.

The Clerk is directed to transmit this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: September 30, 2019

John T. Copenhaver, Jr.
Senior United States District Judge